Lynn Lincoln Sarko (WSBA #16569)
lsarko@kellerrohrback.com
Mark A. Griffin (WSBA #16296)
mgriffin@kellerrohrback.com
Derek W. Loeser (WSBA #24274)
dloeser@kellerrohrback.com
Raymond J. Farrow (WSBA #31782)
rfarrow@kellerrohrback.com
Daniel P. Mensher (WSBA #47719)
dmensher@kellerrohrback.com
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
(206) 623-1900, Fax (206) 623-3384

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

| | |
|---|---|
| CITY OF EVERETT, | |
| Plaintiff, | No. |
| v. | **CLASS ACTION COMPLAINT** |
| GENERAL CHEMICAL CORPORATION; GENERAL CHEMICAL PERFORMANCE PRODUCTS, LLC; CHEMTRADE LOGISTICS INC.; CHEMTRADE CHEMICALS CORPORATION; CHEMTRADE CHEMICALS US, LLC; GENTEK, INC.; KEMIRA CHEMICALS, INC.,; AND FRANK A. REICHL, AND JOHN DOES 1-50, | JURY TRIAL DEMANDED |
| Defendants. | |

Plaintiff, the City of Everett ("Plaintiff"), brings this civil antitrust action under Section 1 of the Sherman Act and Sections 4 and 16 of the Clayton Act, for treble damages, costs of suit, and other relief as maybe determined appropriate, on behalf of a Class of persons and entities who purchased liquid aluminum sulfate ("Alum") against Defendants General Chemical Corporation; General Chemical Performance Products, LLC, Chemtrade Logistics Inc.; Chemtrade Chemicals Corporation; Chemtrade

CLASS ACTION COMPLAINT - 1

Chemicals US, LLC; GenTek, Inc.; Frank A. Reichl; and John Does 1-50 (together "Defendants") for Defendants' conspiracy and agreement to fix, raise, inflate, maintain or stabilize prices of Alum, rig bids and allocate customers for Alum supplied to municipalities, pulp and paper companies, agricultural companies and all other direct purchasers in the United States.

As more fully detailed *infra*, Frank Reichl, a former senior executive at defendant General Chemical Corporation has pleaded guilty to participating in said conspiracy already. As a result of Defendants' unlawful conduct, Plaintiff and the other members of the proposed Class paid artificially inflated prices that exceeded the amount they would have paid if a competitive market had determined prices for Alum. Based upon personal knowledge, information, belief, and investigation of counsel, Plaintiff specifically alleges:

## I.    JURISDICTION AND VENUE

1.      This Court has original federal question jurisdiction over the Sherman Act claim pursuant to 28 U.S.C. §§ 1331 and 1337 and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §15 and 26.

2.      Venue is proper in this judicial district pursuant to Sections 4(a) and 12 of the Clayton Act, 15 U.S.C. §§ 15 and 22, and 28 U.S.C. § 1391(b), (c) and (d), because during the Class Period one or more Defendants resided in, transacted business in, were found in, or had agents in this District, and a substantial part of the events giving rise to Plaintiff's claims occurred and the conduct giving rise to Plaintiff's claim occurred in part in this District.

3.      This Court has personal jurisdiction over each Defendant because, *inter alia*, each Defendant: (a) transacted business in this District; (b) directly or indirectly sold and delivered liquid aluminum sulfate in this District; (c) has substantial aggregate contacts with this District; and (d) engaged in an illegal price-fixing conspiracy to fix prices of liquid aluminum sulfate that was directed at, and had the intended effect of causing injury to, persons and entities residing in, located in, or doing

CLASS ACTION COMPLAINT - 2

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

business in this District.

## II.     PARTIES

### A.     PLAINTIFF

4.     Plaintiff, the City of Everett, a Washington municipal corporation, directly purchased liquid aluminum sulfate from one or more of the Defendants at supra-competitive prices and suffered antitrust injury and damages as a result.

### B.     DEFENDANTS

5.     Defendant, General Chemical Corporation ("General Chemical USA"), was a Delaware corporation founded in 1899, renamed Chemtrade Chemicals Corporation on February 11, 2015, with its principal executive office located at 90 East Halsey Road, Parsippany, New Jersey 07054. The business was acquired by a private equity company, American Securities LLC, in October 2009, which then sold the business to Defendant Chemtrade Logistics Inc. in January 2014. Defendant General Chemical Corporation, renamed Chemtrade Chemicals Corporation, and now generally known in the industry as General Chemical USA, is still headquartered at 90 East Halsey Road, Parsippany, New Jersey 07054, with its corporate offices located at 155 Gordon Baker Road, Suite 300, Toronto, Ontario M2H 3NS, and its Technical Service for water treatment and pulp and paper headquarters located at Syracuse Technical Center, 1421 Willis Avenue, Syracuse, NY 13204. General Chemical USA operates over 40 facilities across the United States, which sell products for a wide range of uses, including municipal water treatment, general industrial production, pulp and paper, food and beverage, agriculture and pharmaceuticals.

6.     For the vast majority of the Class Period from at least 1997 to at least July 2010, Frank A. Reichl was General Manager of Water Chemicals or Vice President of Sales and Marketing for General Chemical Corporation, which approved, authorized and/or ordered his participation in the price-

CLASS ACTION COMPLAINT - 3

fixing and bid-rigging conspiracy alleged herein. During the relevant period, General Chemical USA sold liquid aluminum sulfate directly to purchasers in the United States, including plaintiff. General Chemical Corp. has been granted conditional amnesty by the United States Department of Justice for its conduct relating to the Alum conspiracy, which required General Chemical to admit engaging in criminal anticompetitive conduct.

7. Defendant General Chemical Performance Products LLC ("General Chemical P.P.") was a Delaware limited liability company, renamed Chemtrade Chemicals US LLC on June 4, 2014, with its principal headquarters located at 90 E. Halsey Road, Parsippany, New Jersey 07054. The business was acquired by a private equity company, American Securities LLC, in October 2009, which then sold the business to Defendant Chemtrade Logistics Inc. in January 2014. Defendant General Chemical P.P., now Chemtrade Chemicals US LLC, is still based at 90 East Halsey Road, Parsippany, New Jersey 07054, with its corporate offices located at 155 Gordon Baker Road, Suite 300, Toronto, Ontario M2H 3NS, and its Technical Service for water treatment and pulp and paper headquarters located at Syracuse Technical Center, 1421 Willis Avenue, Syracuse, NY 13204. General Chemical P.P. operates over 40 facilities across the United States, which sell products for a wide range of uses, including municipal water treatment, general industrial production, pulp and paper, food and beverage, agriculture and pharmaceuticals.

8. For the vast majority of the Class Period from at least 1997 to at least July 2010, Frank A. Reichl was General Manager of Water Chemicals or Vice President of Sales and Marketing for General Chemical P.P., which approved, authorized and/or ordered his participation in the price-fixing, customer allocation and bid-rigging conspiracy alleged herein. During the relevant period, General Chemical P.P. sold liquid aluminum sulfate directly to purchasers in the United States.

9. Defendant, Chemtrade Logistics Inc., formerly known as Chemtrade Logistics Income

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

Fund, ("Chemtrade"), is a Canadian corporation traded on the Toronto Stock Exchange (TSX: CHE.UN) that acquired the assets and liabilities of General Chemical Holding Company and its subsidiaries General Chemical Corporation, General Chemical Performance Products LLC and GenTek Inc. on January 23, 2014, with its principal place of business located at 155 Gordon Baker Road, Suite 300 Toronto, Ontario, Canada M2H 3N5. Chemtrade owns a total of 62 production facilities in North America, including those manufacturing inorganic coagulants used in water treatment and liquid aluminum sulfate. As the legal successor in interest to General Chemical Corporation and General Chemical Performance Products LLC, Chemtrade assumes liability for damages cause by General Chemical USA's participation in the price-fixing, customer allocation and bid-rigging conspiracy alleged herein.

10.     Defendant, Chemtrade Chemicals US, LLC, is a Delaware limited liability company and wholly owned subsidiary of Defendant Chemtrade Logistics Inc. During the relevant period, Chemtrade Chemicals US, LLC sold liquid aluminum sulfate directly to purchasers in the United States, including plaintiff.

11.     Defendant, Chemtrade Chemicals Corporation, is a Delaware corporation and wholly owned subsidiary of Defendant Chemtrade Logistics Inc. During the relevant period, Chemtrade Chemicals Corporation sold liquid aluminum sulfate directly to purchasers in the United States.

12.     Defendant, GenTek, Inc., is a Delaware corporation, with its principal place of business located at 90 East Halsey Road, Parsippany, New Jersey 07054, and was a publicly traded company until it was acquired by private equity company American Securities LLC in October 2009, which then sold the business to Chemtrade Logistics Inc. in January 2014. General Chemical Corporation was a wholly owned subsidiary of GenTek, Inc. from approximately 1999 until the acquisition by American Securities LLC in October 2009. At all relevant times, General Chemical Corporation's parent company

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

GenTek, Inc. was aware of, approved, authorized and/or ordered the participation of General Chemical Corporation in the price-fixing, customer allocation and bid-rigging conspiracy alleged herein.[1]

13.     Defendant Frank A. Reichl ("Reichl") is a resident of Flanders, New Jersey. For the vast majority of the Class Period from at least 1997 to at least July 2010, Frank A. Reichl was General Manager of Water Chemicals or Vice President of Sales and Marketing for General Chemical Corporation and General Chemical Performance Products LLC. As both General Manager and Vice President, Reichl oversaw the sale and marketing of water treatment chemicals, including liquid aluminum sulfate, and was responsible for pricing and strategy, analyzing proposals, determining prices, approving bids and price proposals and supervising other sales and marketing employees for General Chemical USA. Reichl pled guilty for his participation in the price-fixing, customer allocation and bid-rigging conspiracy alleged herein on October 27, 2015.

14.     The acts alleged herein to have been committed by Defendants were authorized, ordered or performed by Defendants' directors, officers, managers, employees, agents or representatives in the course of their employment and while actively engaged in the management of Defendants' businesses.

## C.   UNNAMED CO-CONSPIRATORS

15.     On information and belief, various other persons, companies and corporations not named as Defendants have participated in the conspiracy with Defendants alleged herein.

16.     The acts alleged herein that were done by each of the co-conspirators were fully

---

[1] Around October 11, 2002, GenTek filed a voluntary Chapter 11 petition in the United States Bankruptcy Court for the District of Delaware, including bankruptcy filings on behalf of its subsidiaries, including General Chemical Corporation. Effective October 7, 2003, GenTek and General Chemical Corporation were discharged from bankruptcy under a plan of reorganization. After their discharge, GenTek and General Chemical Corporation reaffirmed their participation in the conspiracy, in part by continuing to engage in the conduct described herein with respect to Alum. Regardless of the period during which GenTek and General Chemical participated in the conspiracy, this complaint seeks to recover damages from GenTek and General Chemical only for their post-discharge conduct, and in no way seeks to violate any orders of the Bankruptcy Court. However, the damages arising from GenTek's and General Chemical's post-discharge conduct include damages incurred by Plaintiff and the Class throughout the Class Period, and this complaint seeks to recover damages from the remaining Defendants for GenTek's and General Chemical's pre-discharge conspiratorial conduct.

CLASS ACTION COMPLAINT - 6

authorized by each of those co-conspirators, or ordered or committed by duly authorized officers, managers, agents, employees or representatives of each co-conspirator while actively engaged in the management, direction, or control of its affairs.

## III.     INTERSTATE TRADE AND COMMERCE

17.     Throughout the Class Period, there was a continuous and uninterrupted flow of interstate trade and commerce throughout the United States in the sale of liquid aluminum sulfate by Defendants to their customers located throughout the United States.

18.     Throughout the Class Period, Defendants' conspiracy and agreement to fix, raise, inflate, maintain or stabilize prices of liquid aluminum sulfate in the United States took place within and substantially affected the flow of interstate commerce and had a direct, substantial and reasonably foreseeable effect upon commerce throughout the United States.

## IV.     RELEVANT MARKET

19.     The relevant market alleged herein is the market for liquid aluminum sulfate sold in the United States, its territories and the District of Columbia.

## V.     FACTUAL ALLEGATIONS

### A.     Background

20.     Aluminum sulfate, also known as "Alum," is a widely-used and versatile industrial chemical compound with many important roles in products used in many homes and industries. Alum is sold in dry and liquid forms.

21.     Alum is a water treatment chemical that removes impurities and other substances from water. Alum is the salt of sulfuric acid and aluminum hydroxide known by its chemical name $Al_2(SO_4)_3$. In its most common uses in the municipal water system and paper industries, Alum is a source of $Al^{3+}$, which is a highly charged ionic "species" that attracts negative particles, such as those

CLASS ACTION COMPLAINT - 7

that discolor raw water supplies, reacts with negative particles, and then precipitates those participles out of the solution as ionic solids.

22.     Much of the Alum produced today is used for water and wastewater treatment for clarification and phosphorus removal, and as a flocculating agent in the purification of drinking water. In water purification, aluminum sulfate causes impurities to coagulate into larger particles or clump together and then settle to the bottom of the container or be filtered out more easily. This process is called coagulation or flocculation.

23.     Dry aluminum sulfate is an odorless, white or off-white to pale green crystalline solid or powder that is sold in powdered and ground forms. The compound is made by adding aluminum hydroxide to sulfuric acid.

24.     Liquid aluminum sulfate is a clear, odorless aqueous solution.

25.     The liquid product is widely preferred because of its ease and convenience of handling and its economy of application. Facilities for liquid aluminum sulfate are easily installed. Some equipment is required for the bulk storage and handling of liquid alum delivered in either tank cars or tank transports.

26.     Liquid aluminum sulfate is transported to the customer by rail or truck, generally from the manufacturing plant of the supplier that is closest to the customer. The cost of freight is a significant component of the price of liquid aluminum sulfate charged to municipal customers and pulp and paper manufacturers.

27.     Because of the high costs of transporting liquid aluminum sulfate, some suppliers may find that providing the product to a particular buyer is not deemed "freight logical," that is, the supplier cannot make a profit on the business taking into account the distance from the supplier's plant to the customer and the corresponding cost of freight.

CLASS ACTION COMPLAINT - 8

28.     Liquid alum is shipped in stainless steel tank transports. Usually the storage tanks are sized so that approximately ten days' of inventory are provided. Municipal potable water and wastewater treatment plants may require 30 days' inventory.

29.     Liquid alum is delivered to some customers in rubber-lined tank cars of 10,000 and 20,000 U.S. gallons capacity, where the customer must provide adequate facilities for handling tank cars, including a rail siding, suitable access, platforms, unloading hoses and a source of compressed air. Minimum recommended storage tank capacity for tank car delivery is 15,000 U.S. gallons.

30.     Aluminum sulfate is used in industrial effluent treatment including wastewaters from food, dairy, oil, textiles and chemical industries.

31.     Aluminum sulfate is widely used for lake and pond restoration, treatment and nutrient inactivation and the removal of excess nutrients, such as phosphates that contribute to algae growth.

32.     Another major use of aluminum sulfate is as an additive in papermaking and paper sizing agent. It is used for charge neutralization, rosin sizing and pitch control in the pulp and paper industry.

33.     Aluminum sulfate is also used to fix dyes to fabrics and textiles without altering the color of the dye.

34.     Aluminum sulfate has other uses including in the production of aluminum chemicals; as a foaming agent in fire extinguisher compounds; as a soil additives to reduce the pH and increase the acidity of garden soil; in fertilizer, soaps, greases, drugs and cosmetics; for ammonia control in poultry houses; as a waterproofing agent and accelerator in concrete; and for various food processing purposes.

**B.      Market Consolidation.**

35.     The Alum industry experienced heavy consolidation in the period leading up to and including 1997. One producer, GEO Specialty, made several acquisitions between 1993 and 1997. In June 1993, GEO Specialty acquired the Gulf Coast alum business and customer list of Rhone Poulenc,

CLASS ACTION COMPLAINT - 9

a large French chemical company that exited the United States market with the sale. In December 1996, GEO Specialty acquired Cytec's Alum business, which included seven Alum plants in the Southeast. GEO Specialty's purchase of Cytec made it a major national supplier of Alum immediately before the start of the Class Period. In March 1997, GEO Specialty announced that it was acquiring the U.S. and Canadian paper chemicals business of Henkel Corporation. In September 1998, Denny Grandle, GEO Specialty VP and General Manager, Aluminum Products Division, commented that "[t]he consolidation has helped capacity," noting that GEO Specialty has recently closed an Alum plant in Spring Hill, Louisiana.

36.     In June 1997, General Chemical purchased Augusta Georgia-based Peridot, a producer of various chemicals including Alum. General Chemical and GEO Specialty's acquisitions immediately before the start of the Class Period left them with the largest Alum market shares by 1998.

37.     According to an October 1999 article by ICIS, which purports to be "the world's largest petrochemical market information provider," "[p]rior to 1998, the alum industry went through a period of stiff competition that triggered a downturn in its major markets." However, according to the same article, around 1998 Alum prices started shifting upwards.

C.     **Market Pricing**

38.     Municipalities usually acquire their supplies of liquid aluminum sulfate through a publicly-advertised competitive bidding process. Municipal contracts for liquid aluminum sulfate are usually one year in duration, although some contracts provide for renewal for a period of time. The results of municipal bidding processes are typically made public.

39.     Pulp and paper manufacturers usually acquire their supplies of liquid aluminum sulfate pursuant to requests for price bids issued to suppliers of liquid aluminum sulfate. Contracts for supply of liquid aluminum sulfate to pulp and paper manufacturers may last for a year or more. The terms of

CLASS ACTION COMPLAINT - 10

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

the resulting contracts are subject to negotiation, and the results of those negotiations with pulp and paper manufacturers are typically not made public.

40.     The Water Research Foundation, in a 2009 report entitled "Supply of Critical Drinking Water and Wastewater Treatment Chemicals – A White Paper for Understanding Recent Chemical Price Increases and Shortages" ("WRF Report"), stated at A-2 that "Alum is a commodity chemical" and reported price increases for water-treating compounds, including liquid aluminum sulfate as detailed as follows:



Figure 1. U.S. PPI for water-treating compounds (1986–2008).
Source: BLS, 2009.

Available at http://www.waterrf.org/PublicReportLibrary/91264.pdf

41.     During the early part of the Class period from 1997 to 2004, Alum prices experienced significant increases. According to data from the Chemical Market Reporter, from 1998 to 2004 liquid aluminum sulfate prices increased by over one-third, while prices for dry aluminum sulfate increased at least three-fold. During the period from 1998 to 2004, there were numerous parallel price increases by Defendants.

42.     According to ICIS, prior to 1998, "the alum industry went through a period of stiff

CLASS ACTION COMPLAINT - 11

competition that triggered a downturn in its major markets." That changed in January 1998 when a price increase of $7 per ton for liquid alum was announced by the market leaders in January of 1998, although it did not fully take. In September of 1998, General Chemical and GEO announced price increases of $15 per ton for dry alum. As noted at the time by Karla Doremus-Tranfield ("Doremus-Tranfield"), a marketing manager for General Chemical, this price increase was the first since 1991. The purpose was apparently to bring the price of dry alum in line with that for liquid alum.

43.    In October of 1999, General Chemical announced a second price increase for dry alum of $15 per ton, which GEO was expected to match. Doremus-Tranfield noted that the 1998 price increase had been largely successful: "[f]or the most part, pricing shifted upward." The 1999 price increase was imposed despite declining demand. Doremus-Tranfield observed that "[t]he downturn in pulp and paper has led to reduced volumes for alum." The price increase was effectuated even though usage of dry alum by water treatment authorities was also declining, because they preferred to use liquid alum.

44.    In November of 2000, GEO initiated a price increase of $8 per ton on alum, which other producers followed. Denny Grandle, Vice-President and General Manager of GEO's aluminum products group, remarked that "[p]ricing is finally starting to gain ground, although it still has a ways to go to get back to where it was eight to 10 years ago."

45.    General Chemical and GEO made sure that they made up for lost ground. In October 2003 they announced $10 per ton increases on both dry and liquid alum, and again in November of 2003, joined by Kemiron Companies, they announced another $10 per ton increase for both dry and liquid alum.

46.    Subsequently, in September of 2004, GEO announced a price increase of $10 per ton for both dry and liquid alum, despite the fact that there was virtually no growth in the water treatment sector and demand in the pulp and paper sector had contracted. Increasing costs for raw materials were blamed

CLASS ACTION COMPLAINT - 12

1   for the increase.

2       47.     General Chemical followed suit with its own price increases in December of 2004, which

3   were also attributed to increases in the costs of raw materials. Rich Fedison, the Director of Sales &

4   Marketing for General Chemical Performance Products, was quoted as saying that demand had

5   stabilized and that "[a]ll announced price increases for aluminum-based inorganic coagulants are

6   continuing to hold in all end-use markets."

7       48.     The WRF Report disclosed a survey about the rising costs of water treatment chemicals

8   during the period between January of 2008 and January of 2009.  The survey was administered by the

9   Association of Metropolitan Water Agencies and 47 United States drinking water utilities responded.

10  Twenty-five of those entities reported using alum and, during the period of that single year, reported an

11  average 53% price increase, with maximum increases being as high as 168%. Again, raw material cost

12  increases were cited as the major cause of these increases. However, as the WERF Report noted, the

13  "boom" in commodities prices was over by mid-2008.

14      49.     GenTek reported in its 2009 Form 10-K filed for the year 2008 that price increases on

15  products such as alum contributed significantly to the profits earned by GenTek on successful bids or

16  responses to RFPs in the water treatment market: "[s]ales into the water treatment market increased by

17  $67 million [$482 million in 2008, as opposed to $397 million in 2007] driven by $59 million resulting

18  from increases in selling prices...."

**D.     Barriers to Entry and Market Concentration**

        50.     There are significant entry barriers to the market for water treatment chemicals such as

Alum. These barriers include production, manufacturing, and transportation costs, as well as satisfaction

of regulatory requirements. For example, General Chemical's current website makes much of the fact

that "all of our facilities are NSF certified, to the NSF/ANSI Standard 60: Drinking Water Treatment

CLASS ACTION COMPLAINT - 13

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

Chemicals --Health Effects."

51.    GenTek's Form 10-Ks submitted to the United States Securities & Exchange Commission ("SEC") issued between 2003 and 2009 repeatedly identified General Chemical as the "largest North American producer" of Alum. Its main competitor was identified as GEO.

52.    As GenTek reported in the 2009 Form 10-K for the year, price increases on products such as Alum contributed significantly to the profits earned by GenTek on successful bids or responses to RFPs in the water treatment market: "[s]ales into the water treatment market increased by $67 million [$482 million in 2008, as opposed to $397 million in 2007] driven by $59 million resulting from increases in selling prices.…"

53.    Following a series of acquisitions, by 2009 the WRF Report estimated that there were 50 to 60 Alum manufacturing plants located in the United States. As of the time of the Chemtrade acquisition, General Chemical and GEO owned approximately 49 of these manufacturing plants, giving the two companies a predominant share of two primary markets for aluminum sulfate: (1) governmental water treatment facilities that are either owned by governmental bodies or are owned by private entities that contract out their services to governmental entities and (2) pulp and paper manufacturers.

54.    There is limited growth within these markets. As noted in the Kemira Oyj 2014 Annual Report, "[o]nly modest growth can be expected in the Municipal & Industrial segment's relevant market in Europe and North America, as water treatment infrastructure is already largely built and growth in demand is therefore restricted."

55.    The chemical industry market information provider, ICIS, similarly noted in a September 17, 2004 report that "the alum market has not seen a significant jump in new growth this year, as the market continues to be balanced overall and very mature, with annual demand growth in the range of 2 to 3 percent. Additionally, the water treatment market has not seen any additional growth of note over

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

1    the past year."

2    **E.    There Are No Apparent Economic Substitutes for Alum.**

3        56.    The lack of available substitutes for a product facilitates collusion among producers

4    because customers are not able to avoid supra-competitive prices for Alum by switching to another type

5    of inorganic coagulant.

6        57.    There are several other chemicals that can provide some of the properties of Alum such

7    as aluminum chloride, polyaluminum chloride ("PAC"), aluminum chlorohydrate, ferric sulfate, and

8    ferric chloride. However, while these goods can be functional substitutes for Alum, they are not

9    necessarily economic substitutes for Alum. An article from Chemical Market Reporter notes that

10   "[b]ecause PAC compounds are processed more than basic water treatment chemicals like aluminum

11   sulfate, they are pricier. The PAC family, which includes aluminum chloride, PAC and aluminum

12   chlorohydrate, accounts for 15 percent of the water treatment market. Alum is the most mature product

13   and has a market share of more than 40 percent." Another article states that the market for Alum

14   benefited from the "recent trend toward phosphorous reduction in water treatment as municipalities turn

15   back to alum from iron salts – which are less efficient binders than aluminum compounds – as the most

16   cost-effective method of lowering phosphorous levels."

17       58.    A further reason that other chemicals are not true substitutes for Alum at water treatment

18   facilities is because each chemical is dosed and applied differently at water treatment facilities.

19   Therefore, there are substantial infrastructure and other costs associated with switching the treatment

20   chemical used by any particular water treatment facility. Further, other water treatment chemicals are

21   typically more expensive than liquid aluminum sulfate.

22   **F.    Input Costs Were Stable or Declining**

23       59.    During much of the period during which the prices of liquid aluminum sulfate increased,

CLASS ACTION COMPLAINT - 15

the prices of key raw materials used in its production were declining. Bauxite prices declined by almost 50% from 1991 to 2003, rose by only 6% from 2003 to 2007, and then leveled off and declined slightly by the end of 2007.



Available at

http://www.australianbauxite.com.au/sitefolders/232/images/Metallurgical%20Bauxite/Graph2.jpg

60.    Aluminum prices also do not explain the price increases in liquid aluminum sulfate, with price hikes in the period 2006 to 2008 and steep drop in 2009:



CLASS ACTION COMPLAINT - 16

Available at http://www.infomine.com/investment/metal-prices/aluminum/all/

61.    Sulfuric acid prices also do not explain the price increases in liquid aluminum sulfate, with price hikes in 2007 and 2008 and a sharp decline in 2009:



Figure 1.20    Tampa Sulfuric Acid Price Trend

Available at http://yosemite.epa.gov/oa/eab_web docket.nsf/Filings%20By%20Appeal%20Number/EFAE40 E5FFEFBBF785257A2A0047AC45/$File/Exhibit%2052m%20to%20Revised%20Petition%20f or%20Review%20...12.52m.pdf

**G.    U.S. DOJ Investigation and Guilty Plea**

62.    On October 27, 2015, the United States Department of Justice, Antitrust Division ("DOJ") and the FBI's Newark, New Jersey Division announced that Frank A. Reichl, of Flanders, New Jersey and a former executive with Defendants General Chemical Corporation and General Chemical Performance Products LLC, pleaded guilty for his role in a conspiracy to eliminate competition by fixing prices, rigging bids and allocating customers for liquid aluminum sulfate in the United States.

63.    Reichl admitted to his participation in a continuing agreement, understanding and concert of action among himself and his co-conspirators, the substantial terms of which were to rig bid, allocate

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

customers and fix, stabilize and maintain the price of liquid aluminum sulfate sold to municipalities and pulp and paper companies in the United States.

64.     From at least 1997 until July 2010, Reichl and his co-conspirators conspired to circumvent competitive bidding and independent pricing and to raise prices by submitting artificially inflated bids and:

a.     met to discuss each other's liquid aluminum sulfate business;

b.     agreed to "stay away" from each other's historical customers by not pursuing the business of those customers;

c.     kept track of bid and pricing histories to determine which accounts were the "historical" customers of each co-conspirator and other supplier of liquid aluminum sulfate, so as to determine whether to pursue a particular contract or to submit an intentionally losing or "throw away" bid or price quotation;

d.     submitted intentionally losing bids or "throw away" bids or price quotations to each other's historic liquid aluminum sulfate customers to favor the intended winner of the business;

e.     withdrew inadvertently winning bids from another co-conspirator's historical customers as the request of the co-conspirator;

f.     where a co-conspirator could not withdraw its inadvertently winning bid at the historical customer of a co-conspirator, bidding to lose one of its own customers to compensate for the loss of that historical customer;

g.     met to discuss prices to be quoted or bid to customers by the intended winner to determine the amount of the intended loser's intentionally losing bid or price quotation;

h.     and instructed new employees as to how to determine whether and how to bid on or quote a price for liquid aluminum sulfate customers so as to comport with the agreements not to compete with

CLASS ACTION COMPLAINT - 18

the co-conspirators.

65.    Reichl is the first defendant to plead guilty in the continuing investigation into collusion in the liquid aluminum sulfate industry.

66.    Reichl is scheduled to be sentenced on February 1, 2016 and has agreed to cooperate with federal government investigators in the ongoing investigation of the co-conspirators.

67.    The Government's Unopposed Motion to Authorize Alternative Victim Notification Procedures filed in the criminal proceeding against Reichl provides that "[t]here are potentially hundreds of municipalities and pulp and paper companies that were affected over the thirteen-year course of the conspiracy, and the Plea Agreement and Information do not identify any particular accounts as those that were affected by the conspiracy nor do they identify Reichl's co-conspirators. Therefore, the potential crime victims of the charged conspiracy to which Defendant will plead guilty include, at a minimum, all municipalities and pulp and paper companies that purchased liquid aluminum sulfate from 1997 until July 2010."

68.    In addition, Defendant Chemtrade Logistics Inc., formerly known as Chemtrade Logistics Income Fund, disclosed in its Annual Information Forms on March 4, 2014 and again on March 5, 2015 that it had received "conditional amnesty" in the DOJ investigation "concerning alleged anticompetitive conduct in the water treatment chemicals industry." The disclosure of the guilty plea of Reichl now makes it clear that Chemtrade was referring to the investigation of liquid aluminum sulfate.

69.    For an applicant to be granted any type of immunity from criminal conviction from the DOJ, the applicant must admit a criminal violation of the antitrust laws by the corporation. The applicant must admit its participation in a criminal antitrust violation involving price fixing, bid rigging, capacity restriction or allocation of markets, customers, or sales or production volumes before it will receive a conditional leniency letter.

CLASS ACTION COMPLAINT - 19

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

## H.    Opportunities to Collude

70.    As evidenced by Reichl's indictment, there were numerous opportunities for Defendants to communicate and conspire with each other and their co-conspirators. Defendants and their co-conspirators regularly met and discussed each other's business, entered in "not-to-compete" agreements, allocated customers and submitted artificially inflated bids. See Indictment ¶ 13, *United States v. Frank A. Reichl*, 2:15-cr-00554 (D.N.J.).

71.    Notably, representatives, including Reichl, from General Chemical frequently attended national and local industry conferences where they had the opportunity to meet with Defendants and their co-conspirators and collude. For example, in May 2001 and June of 2004 Christopher B. Lind of General Chemical attended annual Conferences of the Florida Lake Management Society.

72.    The American Water Works Association ("AWWA") also provides Defendants and their co-conspirators numerous opportunities to collude with other Alum providers. In addition to national level meetings, trainings, and networking events, there are over forty state or regional AWWA sections that hold their own meetings, trainings, and networking events. For instance, the Southwest Section of the AWWA includes Alum producers Affinity Chemical (including Frank Reichl), Hawkins, Chemtrade, and Kemira Chemicals ("Kemira"). Other suppliers, such as Thatcher, participate in various other regional AWWA sections.

73.    The American Chemistry Council ("ACC") is America's oldest trade association of its kind and includes companies engaged in the business of chemistry. Defendants and other suppliers attended ACC's regular meetings and conferences, including executives from Chemtrade, GenTek, Kemira, Univar and PVS Chemicals.

74.    Notably, Reichl frequently participated in industry conferences for many years where he had the opportunity to meet and collude with Defendants and their co-conspirators. These conferences

CLASS ACTION COMPLAINT - 20

included those sponsored by the Arkansas Water Works & Water Environment Association, Southwest Section of the American Water Works Association, and Georgia Association of Water Professionals. Reichl attended such conferences with representatives from many competitors including Kemira and Affinity Chemical LLC.

75.     Defendants' attendance at industry conference and trade associations facilitated coordinated price increase announcements by Defendants and their co-conspirators. For instance, on December 3, 2004, ICIS, issued an article titled "Aluminum Sulfate Prices Rise with Demand and Costs." Through this medium, Rich Fedison, director of sales and marketing for Defendant General Chemical Performance Products LLC, signaled to the market that demand for aluminum sulfate was stable and beginning to strengthen. He stated: "The pulp and paper sector is finally beginning to recover after several years of poor performance as sustainable price increases and the recovering global economy are driving margin improvement. On the municipal water side, tightening federal regulations on total organic compounds and disinfection byproducts are contributing favorably to the overall demand for inorganic coagulants." Significantly, Fedison stated, "*[a]ll announced price increases for aluminum based inorganic coagulants are continuing to hold in all end-use markets*" (emphasis added). This statement signaled to Defendants and other suppliers, providing a pretext for maintaining the artificially inflated price level for aluminum sulfate.

76.     Contemporaneously, Defendant General Chemical Performance Products LLC raised its list prices for commercial-grade aluminum sulfate to $335 per ton on the East and Gulf Coasts and $370 on the West Coast. Liquid material in tanks was $214 per ton, iron-free liquid material in tanks was $331 per ton, and dry iron-free aluminum sulfate was $425 per ton.

77.     At the same time, USALCO another manufacturer of Alum, raised its prices for aluminum sulfate by $10 per dry ton, effective December 1, 2004, or as contracts permitted.

CLASS ACTION COMPLAINT - 21

78.     Also at the same time, Kemiron Companies raised its prices for all grades of polyaluminum chloride, aluminum chloride, aluminum chlorohydrate, sodium aluminate and polyaluminum sulfate by 2 cents per pound, effective December 1, 2004, or as contracts allowed.

79.     Sample public responses to bid requests by water districts during the Class Period illustrate what appear to be the types of sham "throw-away" bids discussed in the Reichl indictment. Examples include public documents published by the City of Columbia, South Carolina in June of 2009, the City of Texarkana, Arkansas in August of 2009, the Emerald Coast Utilities Authority (in Florida) in June of 2010, and the City of Bellingham (Washington) in 2006, all of which show disparities between the winning bids of General Chemical and those of GEO or other bidders that are consistent with the use of "throw away" bids.

## VI.     ANTITRUST INJURY

80.     The effect of Defendants' and co-conspirators' anti-competitive conduct alleged herein was to artificially inflate the price of liquid aluminum sulfate in the United States.

81.     As a result of Defendants' and co-conspirators' anticompetitive conduct, Plaintiff and members of the Class paid more for liquid aluminum sulfate than they would have paid absent that conduct, and thus have been injured.

## VII.     FRAUDULENT CONCEALMENT

82.     Defendants and other co-conspirators engaged in a successful, unlawful price-fixing conspiracy which, by its very nature, was inherently self-concealing.

83.     Defendants and other co-conspirators used non-public methods of communication, such as private meetings, to conceal their agreements to eliminate competition by fixing prices, rigging bids and allocating customers for liquid aluminum sulfate in the United States.

84.     As a result, until recently neither Plaintiff nor the Class members had knowledge of any

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

of the foregoing violations, and neither Plaintiff nor the Class Members, until recently, could have discovered through reasonable diligence that Defendants and their co-conspirators had engaged in the foregoing violations, since Defendants and their co-conspirators actively and fraudulently concealed these violations to obscure their illegal activity.

85.   Defendants and their co-conspirators wrongfully concealed and carried out their illegal conduct in a manner that was designed to and did preclude detection.

86.   Because Defendants' anticompetitive conduct was both self-concealing and affirmatively concealed, Plaintiff and the members of the Class did not learn or discover the operative facts giving rise to this Complaint prior to October 27, 2015. No information, actual or constructive, was ever made available to Plaintiff and the members of the Class that would have led a reasonably diligent person to investigate whether a conspiracy existed prior to October 27, 2015.

87.   The disclosure of Defendant Chemtrade Logistics Inc., formerly known as Chemtrade Logistics Income Fund, in its Annual Information Forms on March 4, 2014 and again on March 5, 2015 that it had received "conditional amnesty" in the DOJ investigation did not name liquid aluminum sulfate, and thus, did not put Plaintiff on notice that the DOJ investigation involved liquid aluminum sulfate.

88.   Defendants and their co-conspirators engaged in a secret conspiracy that did not reveal facts that would put Plaintiff or the Class on inquiry notice that there was a conspiracy to fix prices for liquid aluminum sulfate.

89.   The municipal water district bid requests often contained anti-collusion statements to which each bidder had to subscribe. Defendants falsely swore that they were complying with those clauses, thereby affirmatively concealing from the entities requesting such bids that collusion was occurring.

CLASS ACTION COMPLAINT - 23

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

90.     Likewise, in responding to requests for proposals sent out by paper and pulp manufacturers, Defendants did not disclose that they were collusively rigging bids.

91.     In announcing price increases for liquid aluminum sulfate, often Defendants and their co-conspirators asserted that the cause of such increases was attributable entirely to higher raw material and energy costs, without disclosing their conspiracy to fix and maintain Alum prices.

92.     Accordingly, Plaintiff could not have had either actual or constructive knowledge of the price fixing scheme until the public disclosure of the DOJ's criminal investigation.

93.     Because Defendants' and their co-conspirators' agreement, understanding and conspiracy was kept secret, Plaintiff and members of the Class were unaware of Defendants' unlawful conduct alleged herein and did not know that they were paying artificially high prices for liquid aluminum sulfate during the Class Period.

94.     For these reasons, Defendants and their co-conspirators' fraudulent concealment tolled the statute of limitations applicable to Plaintiff's and the Class Members' claims which did not begin to run or were otherwise tolled until October 27, 2015.

## VIII.   CLASS ACTION ALLEGATIONS

95.     Plaintiff brings this action on behalf of itself and, under Rules 23(a) and (b) of the Federal Rules of Procedure, on behalf of a class (the "Class") defined as follows:

> All persons and entities that purchased liquid aluminum sulfate in the United States directly from any of the Defendants or their predecessors, subsidiaries or affiliates from at least 1997 to at least July 31, 2010 or such time as the anticompetitive effects of the Defendants' conduct cease (the "Class Period").

96.     Excluded from the Class are Defendants and their employees, subsidiaries, affiliates, parents, partners and agents, whether or not named in this Complaint.

97.     Members of the Class are so numerous and geographically dispersed that joinder is

CLASS ACTION COMPLAINT - 24

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

impracticable. Further, the Class is readily identifiable from information and records in the possession of Defendants.

98.     Plaintiff's claims are typical of the claims of the members of the Class. Plaintiff and members of the Class were damaged by the same wrongful conduct of Defendants and their co-conspirators.

99.     Plaintiff will fairly and adequately protect and represent the interests of the Class. The interests of the Plaintiff are coincident with, and not antagonistic to, those of the Class.

100.    Plaintiff is represented by counsel with experience in the prosecution of class action antitrust litigation.

101.    Questions of law and fact common to the members of the Class predominate over questions that may affect only individual Class members, thereby making damages with respect to the Class as a whole appropriate. Questions of law and fact common to the Class include, but are not limited to:

        a.     whether the Defendants and their co-conspirators colluded to fix, raise, stabilize or maintain the prices of, or to restrict output for, liquid aluminum sulfate in the United States;

        b.     whether Defendants' and their co-conspirators' conduct violated Section 1 of the Sherman Antitrust Act;

        c.     whether the conduct of Defendants and their co-conspirators caused liquid aluminum sulfate prices to be higher than they would have been in the absence of Defendants' and their co-conspirators' conduct;

        d.     whether Defendants' and their co-conspirators' conduct cause injury and damage to the business and property of Plaintiff and the members of the Class;

CLASS ACTION COMPLAINT - 25

e.     whether Defendants and their co-conspirators fraudulently concealed the conspiracy's existence from Plaintiff and other Class members;

f.     the appropriate class-wide measure of damages resulting from the violation of Section 1 of the Sherman Antitrust Act; and

g.     the operative time period of Defendants' and their co-conspirators' violations of Section 1 of the Sherman Antitrust Act.

102.    Class action treatment is a superior method for the fair and efficient adjudication of this controversy. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort or expense that numerous individual actions would require. The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action.

103.    Plaintiff knows of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

## IX.    CLAIM FOR RELIEF
## VIOLATION OF SECTION I OF THE SHERMAN ACT 15 U.S.C. §1.

104.    Plaintiff repeats and reasserts each of the preceding allegations as if fully set forth herein.

105.    Defendants and their co-conspirators engaged in a continuing contract, combination and conspiracy to artificially fix, raise, maintain and/or stabilize the price of liquid aluminum sulfate within the United States, in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

106.    The combination and conspiracy alleged herein is a per se violation of Section 1 of the Sherman Antitrust Act.

CLASS ACTION COMPLAINT - 26

107.    Alternatively, the combination and conspiracy alleged herein is a rule of reason violation of Section 1 of the Sherman Antitrust Act.

108.    Defendants and their co-conspirators intended to and actually did restrain trade. They shared a conscious commitment to a common scheme designed to achieve the unlawful objective of artificially fixing, raising, pegging, maintaining, stabilizing, and otherwise manipulating the price of liquid aluminum sulfate.

109.    The conspiracy unreasonably restrained trade. There is no legitimate business justification for, or procompetitive benefits caused by, Defendants' and their co-conspirators' unreasonable restraint of trade. Any ostensible procompetitive benefit was pretextual or could have been achieved by less restrictive means.

110.    As a result of Defendants' and their co-conspirators' anticompetitive conduct, Plaintiff and members of the Class have been injured in their business and property by reason of Defendants' violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, within the meaning of Section 4 of the Clayton Antitrust Act, 15 U.S.C. § 15.

## X.    REQUEST FOR RELIEF

WHEREFORE, Plaintiff, on behalf of itself and the Class, requests that the Court:

111.    Determine that this action may be maintained as a class action pursuant to Fed. R. Civ. P. 23(a) and (b)(3);

112.    Enter joint and several judgments against the Defendants and in favor of Plaintiff and the Class;

113.    Award the Class damages (i.e., three times overcharges) in an amount to be determined at trial, plus interest in accordance with law;

114.    Award Plaintiff and the Class their costs of suit, including reasonable attorneys' fees as

CLASS ACTION COMPLAINT - 27

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

provided by law; and

115.     Award such further and additional relief as is necessary to correct for the anticompetitive market effects caused by the Defendants' unlawful conduct, as the Court may deem just and proper under the circumstances.

## XI.     JURY DEMAND

116.     Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff, on behalf of itself and the proposed Class, demands a trial by jury on all issues so triable.

DATED this 5th day of February, 2016.

KELLER ROHRBACK L.L.P.


By: */s/ Lynn Lincoln Sarko*
      Lynn Lincoln Sarko (WSBA #16569)
      lsarko@kellerrohrback.com
      Mark A. Griffin (WSBA #16296)
      mgriffin@kellerrohrback.com
      Derek W. Loeser (WSBA #24274)
      dloeser@kellerrohrback.com
      Raymond J. Farrow (WSBA #31782)
      rfarrow@kellerrohrback.com
      Daniel P. Mensher (WSBA #47719)
      dmensher@kellerrohrback.com
      1201 Third Avenue, Suite 3200
      Seattle, WA 98101-3052
      (206) 623-1900, Fax (206) 623-3384

***Attorneys for Plaintiff City of Everett***

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384